May it please the Court, my name is Susan Jane Brown with the Western Environmental Law Center, representing Plaintiff Appellants in this case. Before I begin, I'd like to reserve four minutes for rebuttal, if I may. This Court has held a Forest Service decision arbitrary and capricious when the agency has entirely failed to consider an important aspect of the problem, and has offered an explanation that runs counter to the evidence before the agency. In this case, the Forest Service has failed to consider that important aspect of the problem, and has offered an explanation that runs counter to the evidence before the agency. Both of these lapses have occurred in the agency's determination of the Panther Post Fire timber sales consistency with the aquatic conservation strategy of the Northwest Forest Plan, as well as issuing an emergency situation determination in order to expedite implementation of this project. The first issue that I'd like to turn to today is the Forest Service's finding of the project's consistency with the aquatic conservation strategy of the Northwest Forest Plan. Let me ask you at that point, what's left? Is there anything left that's going to make a difference on that question? Anything left? Well, we've been told that, I think it was the intervener's brief, but at this moment it blurs together, that the work, the harvesting involving the riparian acreage has been either completed or nearly completed at the time the brief was submitted. That's actually incorrect, Your Honor. I believe intervener's brief, although I'm sure Mr. Horngreen can correct me. I may have misrecollected, so. Yeah, the riparian reserve logging is not complete, and the harvest of the whole project is also not complete. So there is quite a few acres, although I don't have the exact number handy, but I do know that the riparian reserve logging is not complete yet. So the Northwest Forest Plan generally prohibits logging in riparian reserves, which are buffers that run along streamcourses. However, there is an exception to the prohibition of logging in riparian reserves when, quote, or the Forest Service is allowed to, quote, allow salvage and fuel wood cutting if required to attain aquatic conservation strategies, and when salvage is, excuse me, and salvage is appropriate only when watershed analysis determines that present and course, present and future coarse woody debris is net and other aquatic conservation strategy objectives are not adversely affected. In this particular case, the Forest Service has not made an aquatic conservation strategy determination as required by this court in Pacific PCFFA v. NIMPS 265 F3rd 1028 at 1036. And the court in that case held that if the Forest Service is going to necessarily take an action in riparian reserves, then that action must comply with the aquatic conservation strategy. And what we have in this case is that the Forest Service, first of all, never made that determination, did not show how the salvage logging is required to attain ACS objectives. But you're interpreting required in a way differently than the agency is. You're trying to say you can't obtain the objectives unless you do this, and what the agency appeared to apply was a test of how we're best going to be able to meet the objectives or which will best serve the ultimate objective. Your Honor, the issue here is that, as I interpret the Forest Service's argument on that point, is that we are undertaking this action, or if we didn't undertake this action, then the ACS objectives may not be met. But the way that the Northwest Forest Plan reads the plain language of the particular provision is that if the Forest Service is taking an action, not just status quo without an activity, because the standards and guidelines of the Northwest Forest Plan only apply when the agency is taking an affirmative action on the ground, in this case a post-fire timber sale. So when the agency does that, the standards and guidelines affirmatively require, allow salvage, which is the type of activity that we're challenging here, if it's required to attain ACS objectives. So the agency here has not made that determination. I haven't heard an answer to my question or my observation. I mean, it seems to me you're confirming exactly what I said, which is that you're trying to place emphasis on the word required, which was applied differently by the agency, which looked at the two circumstances, the proposed plan and no action, and tried to determine which would have the best result to obtain the, toward the aquatic objectives. I mean, it strikes me your argument puts entirely too much pressure on the word required. Well, Your Honor. And when I asked you the question, you came back to the word required. Are you confirming, are you saying, in effect, yes, that you are putting enormous emphasis on the word required? And if it's not, quote, required, close quote, you don't think they can do it? Well, I think that there are two provisions of this standard that is at issue. Certainly required is one of them. And I stand by our position that the agency is going to voluntarily take an action on the ground that it needs to comply with the Northwest Forest Plan. And the Northwest Forest Plan says salvage is okay only if it's required to attain those objectives. The other aspect of the standard is salvage. And what the agency in this case is arguing is, well, what we actually really need to do is reforest this area. And in order to reforest, we have to clear cut the riparian reserves first so that we can replant. So there are two aspects of that standard that appellants are taking issue with. One is that the standard only permits salvage, if required, not replanting. And the agency's focus in this case has been, well, we need to replant in order to obtain those objectives. And we have also taken issue with this need to clear cut first in order to replant. The agency is undertaking quite a bit of activity, replanting activity, through the Black Panther Project, which is a 1,000-acre project to reforest in this area without logging first. So there's a disconnect between the agency's proffered need to replant, but replanting isn't the standard. The standard is you can only enter the riparian reserves with salvage, salvage being that one word, again, if required, to attain ACS objectives. The other thing to consider in this case is that, again, this Court's holding in PCFFA requires the agency to make an affirmative finding that the activity is necessary to meet ACS objectives at all spatial and temporal levels. And in this case, the record does not support an ACS consistency determination. There simply hasn't been one made in this case. So the agency's determination or decision to move forward with salvage logging and riparian reserves runs afoul of quite a few aspects of these standards in the Northwest Forest Plan. The other half of the ACS standard that is at issue here is that the agency must determine, or excuse me, that when watershed analysis determines the present and future horse woody debris needs are met. And in this case, not only does the watershed analysis find the opposite, i.e., that horse woody debris needs are not being met, but the agency itself in the administrative record concedes that it is, in fact, short of horse woody debris needs in the planning area and in riparian reserves. So even if you were to find that appellant's focus on require is an inappropriate focus, the other half of the standard has to deal or has to do with horse woody debris needs, which the Forest Service really cannot address because it just simply doesn't exist in the administrative record. I would direct the Court to, regarding the horse woody debris need issue, the Forest Service has offered some citations to the administrative record, but our reply brief at page 12 and 13 looks at each administrative record citation and notes that horse woody debris is not mentioned in any of them. So the proffered support for the agency's determination that horse woody debris needs have been met simply does not exist in this case. That determination has not been made in addition to the fact that the agency has not determined that salvage and fuel cutting is required to attain ACS objectives. The other issue that is important in this case is the agency's use of an emergency situation determination in order to expedite implementation of this project. And we would point out that nothing in the administrative record in this case demonstrates that eliminating the public's right to a stay pending appeal was necessary to protect public health and safety or natural resources or to prevent a substantial economic loss to the government. I would point the Court to our briefs on this issue. I think that the agency hasn't been able to demonstrate that the record contains information showing why a two-year delay in issuing the emergency situation determination, in fact, amounts to an emergency. And, in fact, this Court's decision in Alliance for the Wild Rockies v. Cottrell, which was reissued in 2011, I believe January of this year, is squarely on point with this particular issue. In the post-fire timber sale in that case, there was also a two-year delay in issuing the emergency situation determination, which the Court found was arbitrary. This is the exact same fact pattern in this case. The Forest Service waited a year to issue an emergency determination and then waited another year while it supposedly did some reanalysis of this project. But, again, the record does not show why the agency couldn't have moved faster. The record does not support that. I mean, they couldn't have moved faster, at least in part, because they got sued. Well, they could have moved faster within that first year. In the litigation, there was, as we point out in our brief, in the chronology of events, once they got sued and we settled our case, they basically did nothing for a year. If they move too fast, then they get sued for not having paid enough careful attention to carefully figuring out all the factors. So it looks like a rock and a hard place. It can be a rock and a hard place, Your Honor, but I would offer that it is possible to expedite post-fire or salvage sales. NEPA provides for alternative arrangements, for example, which can expedite NEPA analysis and review. Forest Service did not avail itself of that opportunity in this case. I would like to go ahead and reserve the remaining balance of my time, if I may, please. Sure. Thank you. Thank you. May it please the Court, Curt Castor for the United States with me at council table is Jamie Rosen, who is senior counsel with the Department of Agriculture, and Scott Horngren, who is representing the intervenors and has requested four minutes of time. I'd like to begin by addressing what I think is a misrepresentation of a standard in the Northwest Forest Plan by appellant. Appellant states to the Court that this project would need to meet both the requirement that it attain aquatic conservation strategy objectives and the requirement that kirth woody debris are met in order to pursue the project consistent with aquatic conservation strategy. In fact, the management guideline in the Northwest Forest Plan allows them to meet either of those two standards. In fact, it sets out three different circumstances under which salvage is permissible in those areas, and the Forest Service can meet any of those three standards to comply. In this case, though, the Forest Service has demonstrated that it's met both, that it's required to attain aquatic conservation strategy objectives, and that kirth woody debris needs are met. I guess I hadn't thought of those as alternatives, so what exactly should I look at to confirm that those are alternatives? Well, admittedly, the language could be somewhat clearer. It doesn't clearly say either must meet all or must meet some. But if you look at them, I think it's relatively clear that they are alternatives. One reason for that is if you look at the three standards, A, B, and C, each of the standards states its relationship to attainment of aquatic conservation strategy objectives. So, for example, under A, it's if required to attain aquatic conservation strategy objectives. Under B, it's aquatic conservation strategy objectives are not adversely affected. And under C, it's needed to attain aquatic conservation strategy objectives. And if the requirement was that you meet each of these three subsections, that language would at best be superfluous and possibly contradictory. Second, each of these subsections is anticipating salvage based on a different purpose. The first is for following catastrophic events. The second is a salvage situation not necessarily followed by a catastrophic event. And the third is application of silviculture practices. So it appears to be dictating different circumstances. And the third- What circumstances are we in here? Well, in this case, it could fall either within A or B because there's salvage where, of course, woody debris needs are met, but there's also been a catastrophic event. So the farthest submission is that both A and B are met. But that's actually a reason why these should be read as separate requirements because if you compare A with C, for example, A is describing a catastrophic situation where there's been a die-off of trees, and C is saying to apply silviculture practices where stand thinning is necessary. And those two criteria would never be met at the same instance because there would never be a circumstance where there's been a catastrophic die-off of trees, but silviculture practices would dictate stand thinning. So those two subsections are clearly designed to deal with separate criteria. I guess that I understand. I just approached this as the catastrophic event situation in light of the Fortis fire and wasn't thinking of the different factual scenarios. And it seems to me this plan was developed specifically in the wake of that event, but you're suggesting that I guess it's alternative B might be applicable under the factual circumstances as well. That's correct. I think that one of the reasons why the decision document takes great pains to outline why the project is necessary to attain aquatic conservation strategy objectives is because this purpose is this project is designed primarily to deal with a catastrophic event. But in theory, had the Panther fire not taken place, but similar conditions were in place in the forest, they could have pursued this project under subsection B. Well, I look at the chief forest's letter, which is in the supple letter, except the record at 160. He seems very concerned with the government making some money. Is that your understanding? I think that that is one of the three stated bases for pursuing the project. There were three bases. One is health and safety of the public and of forest workers. Second is restoration and reforestation of the area. And third was to recover economic value to the Federal Government. Yes, sir. Who gets the money? In this case, a portion of the money is distributed inside of the to the community and to the Forest Service's operational budget. Although in this particular case, Judge Noonan, the net value of this project is negative. So even though the Forest Service would be recovering a portion of the money, the project as a whole is expected to lose money. So I wouldn't characterize this project as an opportunity for the Forest Service to increase its revenue. How do we know who gets the money? There's a document in the record, which is at, I should have a better site for that, Alt 2, 2010 that shows. Could you repeat that? I'll also find the power site for you, which is easier to look up. But it's Alt 2, 2010, which is an economic analysis of the expected loss or gain on the project. And the bottom line shows that we expect this project overall to lose money, even including the revenue that it would generate from sale. But does that document also indicate who is going to receive the $560,000? It doesn't break down where all of the operational money will go. Could you give us that? I can provide a letter to the Court, if the Court would like. Would you do that? Yes, sir. Well, you know I've expressed this in concurrences before. It's very troubling. You're an agency that is an old agency, and the standards are antiquated. But I want to draw your attention to what happened to the minerals mining agency when there was that terrible spill in the Gulf. And Secretary Salazar reorganized the agency so the people making decisions were not the people who were getting money from decisions. And there's a whole string of United States Supreme Court cases indicating it's a violation of due process for an agency or a court to make money out of its governmental decision. Well, Your Honor, I don't think that this case raises a due process concern for either on factual or legal grounds, and I'm happy to explain that. I want to mention first that this case is before the Court on the limited question of whether the district court abused its discretion in failing to award the extraordinary remedy of preliminary relief. None of the parties has specifically raised a due process or a bias concern. I realize that, but I'm just drawing it to your attention as sometimes constitutional issues don't go away. But go ahead. Your Honor, I think on the facts of this case, there's direct evidence that this decision, the decision to pursue this project would have been taken even in the absence of the potential to make revenue. And we know that from the history of the project. The project was originally proposed as a salvage project. Then because of litigation, the project was scrapped and pushed into the winter. At that point, the Forest Service didn't believe that these trees were still merchantable and began to look to do the project as a stewardship project, which is separate funds that generate less revenue for the Forest Service. Then one of the timber companies in the area went and approached the Forest Service and said, hey, we've been out, we've looked at the trees, we think you can still do this as a salvage project and you might be able to make some money, do it that way. And what this history tells us is that even in the situation where the project could not have been bid out to make money, the service still would have been interested in pursuing it, which I think is fairly persuasive evidence that in this particular case, bias was not a determining factor in whether to approve this project. Well, I'm not going to pursue this now, but just as a footnote, I can't refrain from saying it's hard for institutions to realize when they're just getting, it's not a bribe to a judge, but it affects the discretion of the institution. The Ohio Supreme Court had to be corrected twice by the United States Supreme Court. But they didn't understand that getting money out of a decision vitiates the impartiality that's required of a decision maker. And the fact that you would reach the same decision, that a court would reach the same decision, isn't an answer. You're radically disqualified when you're making money out of it. Your antiquated agency doesn't see that just the way the Ohio Supreme Court didn't see it twice. It's hard to see. Well, Your Honor, I note that you used the word a court can't do that. I think there is a, frankly, a different standard that is applied to judicial adjudications. I'm not going to argue it now. I've cited these cases involving administrative agencies as well. Yes, Your Honor. It takes a while for an administrative agency to get the message. And yours has not got it. Just like the mineral management agency did not get it until they had a major disaster. But these things happen, and eventually you'll be corrected. Yes, Your Honor. I'll certainly relay your concerns to the agency. I hope you will. As I mentioned, we believe that you can meet either the requirement to attain aquatic conservation strategies or the courts' woody debris needs are met. In any case, we think both of those standards are met. The project is required to attain aquatic conservation strategy objectives because the specific purpose of those objectives is to restore the aquatic system. And post-fire, there's a need to restore that system. Therefore, I think that rather than focusing solely on the word required, you should look at what required modifies, which is to manage or restore a system. We also think that the record adequately demonstrates that court woody debris are met, which is laid out in the brief. Finally, I want to talk briefly about the emergency situation determination. I should note that at this point the appellants have had the opportunity to pursue their administrative appeal. The only effect of an emergency situation determination is that it prevents the automatic stay that would necessarily stop a project. Now that the appeal has been completed, that stay would have been lifted in any event. So I think the issue is largely academic at this point. If there are no further questions. Thank you. And we'll hear from Mr. Horniman. Thank you, Your Honor. As to the status of the project, the court, the clerk, I think, handed out some maps from the administrative record, and I can just walk you through that briefly. To put this into perspective on a big picture, this was a 63,000-acre fire. 8,000 acres burned within the Elk Creek drainage. The Forest Service took 536 acres to try to do roadside hazard, and then away from the roadside, 214 acres of those were going to be cut. The top ISER-2, the yellow there is the roadside hazard units. They're all done. They're completed. So 322 of the 536 acres are completed. And of the 214 acres remaining, there's about 60 percent of that left, but the riparian areas that we're so concerned about here, there were a total of about 150 acres in the riparian areas. Eighty-seven covered the roadside, and you can see that on the next page. The blue is the riparian areas, and then the crosshatch areas are the roadside harvest and then the unit harvest. And you can see particularly on the left side of the page where the roadside hazard is crossing all the riparian areas. So our estimate is there is riparian areas left approximately 45 acres. In terms of your resolution of this case, we'd urge you to consider the two major changes that have occurred, say, from five, ten years ago in this area. One, an injunction is the exception, not the rule anymore after the Supreme Court Winter case, and the burden is on the plaintiff to show injury. And then second, the discretion, it's very clear now after this Court's en banc decision in the McNair case, that the Court has to defer to the discretion of the Forest Service. And we think in this particular case, the Forest Service did not entirely fail to consider an important aspect of the problem. They did consider the ACS, Aquatic Conservation Strategy objectives, and I would argue that under the standard that they're trying to meet to say, we want to do this project to actually achieve these objectives, I think the record is very solid in that respect, and it wasn't ignored. Three issues there, surface erosion. They want to stop surface erosion. They explained that the logging slash and putting some of the logs on the ground will increase the soil cover because there's no vegetation there, although it is coming back, and it will reduce the post-fire surface erosion. And they particularly want to do that in the riparian areas where the water concentrates, and they have a photograph there in the record, I believe it's on supplemental record 79, where a thunderstorm blew through this area after the fire and caused massive erosion. So they want to do that. Second, landslides. They explained that the proposed action would decrease the likelihood of high-severity fire through fuels treatment and then further decreasing the risk of landsliding and would have a long-term positive effect on hillside stability. Lastly, re-burn. They're concerned that if they plant trees or there's some natural trees in there, they want to reduce the fuel load so that if this area re-burns, like it has before, they mentioned a stanza fire in this same area that burned in 2002, and they said, you know, we don't want it to burn the trees that we're planting here, and that re-burn would provide a problem because the trees we're trying to get going are going to provide shade, provide root strength. So the record is solid in supporting the Forest Service's decision that they do need to do this work to achieve aquatic conservation strategy objectives. Thank you. Thank you. Ms. Brown. So I'd like to start first with the government's rebuttal that it need not comply with all parts of the Northwest Forest Plan standards and guidelines. I'd first point out that the government's position on this and why both standards or all three standards don't apply doesn't actually appear in its briefing. So this is the first time that I've heard that this is the agency's justification for why all standards don't apply. I would simply direct the Court to a couple of legal requirements. The first is found in the National Forest Management Act at 16 U.S.C. section 1604I, which requires the Forest Service, whenever it implements projects, those site-specific projects must comply with Forest Plan standards and guidelines. So the statute requires the agency for those projects to comply with the Forest Plan and not to cherry-pick which standards are going to apply when. I'd also direct this Court to its decision in ONRC v. Brong. That's at 492 F. 3rd. 1120, where this Court held that a post-fire timber sale on BLM lands must comply with all standards and guidelines regarding late-successional reserves under the Northwest Forest Plan. And there the agency was not allowed to pick and choose which aspects of the standards and guidelines it was going to comply with if it needed to comply with all aspects of it. And then finally, I'd refer this Court to Alaska v. Federal Subsistence Board, 544 F. 3rd. 1089, where this Court held that no deference is due to an agency's litigation position involving its interpretation of Forest Plan standards that were offered for the first time in litigation. And that's exactly what's going on here, where the Forest Service is now apparently claiming that it only needs to comply with one part of the Northwest Forest Plan, not all three standards and guidelines. Grammatically, these standards don't say comply with A or B or C. There's a period after each section which suggests that the framers intended for all standards to apply, not just some of them. Moving on to the government's argument that the emergency situation determination didn't really harm plaintiffs in this case because the administrative appeal was eventually denied. This seems to amount to a no harm, no foul type of argument. And plaintiffs would agree with Judge Noonan that this raises some concerns, although certainly not Plett in this case, about due process and whether or not the agency has a bias. If the agency is out implementing it. Roberts, that seems to mix two different subjects. As I understood what was said, it had to do with the emergency declaration not requiring a stay before the administrative process goes forward. The administrative process did go forward. It apparently did not produce a different result. Right. Are you complaining about that result? I mean, is that something? No. What we're concerned about is that when the agency is allowed to implement a decision before the administrative process has run its course, then the agency has a vested interest in affirming its original decision at the end of the administrative process. So in this case, plaintiffs went through the process of filing their administrative appeal, even though there was an emergency situation determination, because we need to do that for exhaustion and those sorts of things. The problem is that when the agency is allowed to implement a decision that really may be not final because the administrative process hasn't run its course, then the agency has an interest in making sure that it affirms its decision rather than taking a little bit of a timeout in evaluating its decision, the administrative challenges to that decision, and then evaluating whether or not it, in fact, should go forward with the decision. And that isn't afforded when you have these emergency situation determinations. I see that my time is up, and so if there aren't any further questions, I'll rest on our case. Apparently not. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes the argument calendar for today, and we are adjourned.
judges: Noonan, Fernandez, Clifton